PETER GRATTAN, as Executor, etc., Respondent, *v.* THE METROPOLITAN LIFE INSURANCE COMPANY, Appellant.

By the terms of a policy of life insurance, issued by defendant, the amount of insurance was to be paid "in sixty days after receipt and acceptance of proofs of death of the insured." In an action upon the policy, it appeared that defendant had blanks for such proofs, and that it was its custom, upon the death of a person insured, to send these blanks to his representative, or for his use to the local agent; that immediately after the death of the insured plaintiff applied to the local agent for blanks, who wrote to defendant, informing it of the death, and of the application, and requesting it to furnish the blanks. A similar application was also made by plaintiff. Defendant declined, on the ground that the policy was null and void, and that it refused to recognize any claim thereunder, and it also directed its agent not to give the usual certificate. *Held*, that the proofs called for must, in view of defendant's custom, be held to relate to proofs according to its instructions, and upon blanks to be furnished by it, and that its refusal to furnish them was a waiver of the requirement.

The complaint alleged that proper proofs were furnished; on the trial, which was before a referee, he gave the plaintiff leave to amend the complaint, by alleging a waiver of the requirement as to proofs. This was granted upon terms, among others, that plaintiff should pay costs, which were accordingly paid, and the amendment made. *Held*, that it was within the power of the referee to allow the amendment, and, if otherwise, defendant, by accepting the costs, was precluded from raising the objection.

In the application for the policy, in answer to the question as to the occupation of the deceased, the answer was, "soda-water maker." In the "medical examiner's certificate," which was required to be and was signed by the applicant, and contained what purported to be transcripts of his answers to the medical examiner, in answer to a question as to the effect of the occupation upon the risk, the answer was, "is out of doors most of the time, selling soda-water; in my opinion healthy occupation." It appeared that the insured made and sold soda-water. *Held*, that the answers were to be taken together, and stated the facts correctly.

The medical examiner was required by his instructions from defendant to give the answers to the questions in the certificate in his own handwriting, and not to allow any person to dictate any portion of them. In answer to a question calling for the family history "of the applicant," he stated correctly the cause of the death of a sister. At the time the insured signed his name to the certificate, the answer had not been written in by the examiner; he subsequently filled in the cause of death as "not known to applicant." *Held*, that the examiner was the agent of defendant for the purpose of reporting the answers; that it, not the insured, was responsible for his mistake in making the entry; and that the mistake did not release defendant from its obligation.

Also, *held*, that it was competent to prove by parol the actual transaction in reply to defendant's claim of breach of warranty and fraud; and this without reforming the contract or asking for equitable relief.

For the purpose of showing the falsity of representations of the insured as to the cause of death of his mother, defendant called a physician who testified that he attended her in her last illness; it did not appear that he ever visited or saw her at any other time or in any other than a professional capacity. The witness was then asked if he knew or was able to state the cause of her death; if he observed the symptoms she exhibited in her sickness; if the symptoms were such as might have been discovered by observation and physical examination, without the aid of any specific statement from the patient, or without their being confidentially disclosed by her, or any friend or attendant, or through any private examination; and also if the statement of the insurer as to the cause of death was true. *Held* (EARL, J., dissenting), that the questions, so far as material, were properly excluded.

The statute prohibiting a physician from disclosing any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to prescribe. (2 R. S., 406, § 73; Code of Civil Procedure, § 834), includes information received through the sense of sight as well as that communicated through the ear. It needs not that an examination of a patient should be private to exclude information so derived; nor is it required that it should be shown in the first instance by formal proof that the information was necessary to enable the physician to prescribe.

The statute includes all knowledge acquired from the patient himself, from the statements of others surrounding him, and from observation of his appearance and symptoms.

The death of the patient does not remove the prohibition, and the physician cannot testify to the cause of death learned by him while attending the patient in a professional capacity.

*Edington* v. *Ætna Ins. Co.* (77 N. Y., 564), and *Pierson* v. *People* (79 id., 424), distinguished.

A witness, not a physician, who saw the mother of the insured in her last sickness, was asked to state his conclusion in reference to the character of her disease. This was objected to and excluded. *Held*, no error.

(Argued February 5, 1880; decided March 9, 1880.)

APPEAL from judgment of the General Term of the Supreme Court, in the third judicial department, affirming a judgment in favor of plaintiff, entered upon the report of a referee.

This action was brought upon a policy of insurance issued by defendant upon the life of Terence Grattan, plaintiff's testator.

The facts appear sufficiently in the opinion.

*Wm. Henry Arnoux*, for appellant. The finding that there was a waiver of service of proofs of death was an error of law upon the facts found. (Co. Litt., 352*a* ; 1 Serg. & R., 444; *Riply* v. *Ætna Ins. Co.*, 30 N. Y., 136; *Underwood* v. *Farmers' J. S. I. Co.*, 57 id., 500; *Commonwealth Ins. Co.* v. *Sennett*, 41 Pa. St., 161; *Diehl* v. *Adams Co. Mut. Ins. Co.*, 58 Penn., 452; *Beatty* v. *Lycoming Ins. Co.*, 66 id., 9; *Security Ins. Co.* v. *Fay*, 22 Mich., 467; *St. Louis Ins. Co.* v. *Kyle*, 11 Mo., 278; *Post* v. *Ætna Fire Ins. Co.*, 43 Barb., 364; *Bennett* v. *Lycoming Ins. Co.*, 67 N. Y., 274; *Brink* v. *Hanover Fire Ins. Co.*, 70 id., 593; *Trask* v. *State Fire and M. Ins. Co.*, 29 Penn., 198; *O'Reilly* v. *Guardian M. L. I. Co.*, 60 N. Y., 169.) The defendant had the right to prove, both by lay and professional witnesses, the cause of the death of the mother of the testator, and the exclusion of such evidence was erroneous. (3 R. S. [Edm. ed.], 397, § 10; 1 id. [Banks' 6th ed.], 1014, § 2; 1 id. [Edm. ed.], 397, § 4; id. [Banks' 6th ed.], 1014; 1 id. [id.], 1018, § 15; *Edington* v. *Ætna Life Ins. Co.*, 77 N. Y., 564; Phillips on Ev., 164; *Duchess of Kingston's Case*, 20 How. St. Tr., 613; *Abbey* v. *Lill*, 5 Bing., 299; *McKee* v. *Nelson*, 4 Cow., 355; *Cottrill* v. *Myrick*, 3 Fairf., 222; *Porter* v. *Poquonnoc Manufacturing Co.*, 17 Conn., 249; *Clapp* v. *Fullerton*, 34 N. Y., 190.) The false representation of the insured in respect to the death of the sister was a breach of the warranty. (*Barteau* v. *Phœnix M. L. I. Co.*, 67 N. Y., 595; *Ætna L. I. Co.* v. *France*, 91 U. S. [1 Otto], 510; *Anderson* v. *Fitzgerald*, 4 H. L. C., 484; *Goddard* v. *Monitor M. F. I. Co.*, 108 Mass., 56; *State M.*

*F. I. Co.* v. *Arthur*, 30 Penn. St., 315.) Knowledge on the part of an agent that such statement was false does not affect the warranty. (*Foote* v. *Ætna L. I. Co.*, 61 N. Y., 571; *Rohrbach* v. *Germania F. I. Co.*, 62 id., 47; *Flyn* v. *Equitable L. I. Co.*, 67 id., 500, 506; *State Mut. F. I. Co.* v. *Arthur*, 30 Penn. St., 331; *Brown* v. *Cattaraugus Co. M. I. Co.*, 18 id., 385; *Alexander* v. *Germania F. I. Co.*, 66 id., 464; *Kennedy* v. *St. Lawrence Co. M. I. Co.*, 10 Barb., 285; *Jennings* v. *Chenango Co. M. I. Co.*, 2 Denio, 75.) The medical examiner of the defendant was not its agent to bind it by any false statement made in his certificate. (*Flynn* v. *Equitable L. I. Co.*, 67 N. Y., 500; *Foote* v. *Ætna L. I. Co.*, 61 id. 571; *Mowry* v. *Rosendale*, 74 id., 360.) The insured having put it in the power of defendant's medical examiner to write a wrong answer as to the cause of death of his sister, should suffer the loss that might result therefrom. (*Knoxville N. Bk.* v. *Clark*, 20 Alb. L. J., 29; *Redlick* v. *Doll*, 54 N. Y., 234; *Blakey* v. *Johnson*, 13 Bush., 197; 26 Am., 254; *Young* v. *Grote*, 4 Bing., 253; *Brown* v. *Reed*, 79 Penn. St., 370; 21 Am., 75; *Angle* v. *N. W. Ins. Co.*, 92 U. S., 330; *Trustees* v. *Hill*, 12 Iowa, 462; *Roach* v. *Carr*, 18 Kan., 529; 26 Am., 788; *McDonald* v. *Muscatine Bk.*, 27 Iowa, 319; *Armstrong* v. *Harshman*, 61 Ind., 52; 28 Am., 665; *Upton* v. *Tribilcock*, 91 U. S., 45, 50; *Lee* v. *Guardian L. Ins. Co.*, 2 Cent. L. J., 495; 5 Bigelow, L. and A. I. R., 18; *Ryan* v. *World M. L. Ins. Co.*, 41 Conn., 168; 19 Am., 490; 4 Life Ins. R., 627; *Smith* v. *Empire Ins. Co.*, 25 Barb., 497; *Richardson* v. *Marine Ins. Co.*, 46 Mo., 394; *Jackson* v. *Croy*, 12 J. R., 227; *Roach* v. *Karr*, 26 Am., 788; *Moran* v. *McLarty*, 75 N. Y., 25; *Wilson* v. *Conway F. Ins. Co.*, 4 R. I., 41.) Even if the physician could be held to be the agent of the company, the provision in the policy that no agent had authority to waive any of its conditions, and the declaration of the insured, that the answers written in the doctor's certificate were true, and according to the answers he had given would bind him. (*Thayer* v. *Agricultural Ins. Co.*, 5 Hun,

566; *Walsh* v. *Hartford F. Ins. Co.*, 73 N. Y., 5, 9.) The admission of parol evidence was illegal, as tending to vary the written contracts declared on. (*Maher* v. *Hibernia Ins. Co.*, 67 N. Y., 283; *Pitcher* v. *Hennessy*, 48 id., 415; *McCall* v. *Sun M. Ins. Co.*, 66 id., 505; *Ryan* v. *World M. L. Ins. Co.*, 41 Conn., 468; *Jennings* v. *Chenango Co. Ins. Co.*, 2 Den., 75; *Franklin F. Ins. Co.* v. *Martin*, 40 N. J., 568; *Dewees* v. *Manhattan Ins. Co.*, 35 id. [6 Vroom], 366; *Atherton* v. *Brown*, 14 Mass., 152; *Wiggins* v. *Boardman*, 14 id., 12; *McCall* v. *Sun M. I. Co.*, 66 N. Y., 505, 517; 4 Life Ins. Cas., 627; *Barrett* v. *Union Mut. Fire Ins. Co.*, 7 Cush., 175; *Jenkins* v. *Quincy Mut. Ins. Co.*, 7 Gray, 370; *Sheldon* v. *Hartford Fire Ins. Co.*, 22 Conn., 235; *Flinn* v. *Tobin*, 1 Mood. & Malk., 367.) The testator fraudulently represented his occupation ; the question in relation thereto referred to the time of application, and to the entire occupation. (*Alexander* v. *Germania Fire Ins. Co.*, 66 N. Y., 466; *Sarsfield* v. *Met. Ins. Co.*, 61 Barb., 479; *State M. F. I. Co.* v. *Arthur*, 30 Penn. St., 315; Flanders on Ins., 289; *Paine* v. *Agricultural Ins. Co.*, 5 T. & C., 619; *Wall* v. *East River M. I. Co.*, 7 N. Y., 370; *Parmlee* v. *Hoffman Fire Ins. Co.*, 54 id., 186; *Goddard* v. *Monitor M. F. Ins. Co.*, 108 Mass., 56; *Maher* v. *Hibernia F. I. Co.*, 67 id., 288; *Ashworth* v. *Builders' M. F. Ins. Co.*, 112 Mass., 422; 17 Am., 117; *Valton* v. *National Fund L. Ass. Co.*, 20 N. Y., 32; *Hartman* v. *Keystone Co.*, 21 Penn., 466, 478; Bliss on Life Ins. [2d ed.], 174; *Smith* v. *Ætna Life Ins. Co.*, 49 N. Y., 211.) The referee had no power to amend the complaint on the trial as he did. (*Railway Co.* v. *McCarthy*, 96 U. S. [6 Otto], 258; *Gold* v. *Banks*, 8 Wend., 563; *Holbrook* v. *White*, 24 id., 169; *Everett* v. *Saltus*, 15 id., 474; *Wright* v. *Reed*, 3 D. & East, 554; *Duffy* v. *O'Donovan*, 46 N. Y., 223; *Winter* v. *Coit*, 7 id., 288; *Shelton* v. *Adams*, 41 Barb., 54; 18 Abb., 405.)

*La Mott W. Rhodes*, for respondent. The evidence of the doctors was properly excluded by the referee, as intended

to disclose privileged communications and information obtained while acting in a professional capacity. (3 R. S. [6th ed.], 671, § 119; Code of Proc., §§ 834, 836; *Edding-ton* v. *Mut. Life Ins. Co.*, 67 N. Y., 185; *Dilleber* v. *Home Life Ins. Co.*, 69 id., 256; *Cahen* v. *Continental Life Ins. Co.*, 69 id., 308; *Gratton* v. *Nat. Life Ins. Co.*, 15 Hun, 77; *Pierson* v. *People*, 13 id., 239; *Hildreth* v. *Shepherd*, 65 Barb., 265; *Wolstenholme* v. *Wolstenholme File Co.*, 3 Lans., 467; *Darling* v. *Miller*, 54 Barb., 149; 2 Wharton's Ev., § 1154.) Plaintiff was not bound to show affirmatively that every answer in his application was true; it rested with defendant to allege and prove the breach complained of. (Bliss on Life Insurance [2d ed.], 621, 622; *Swick* v. *Home Life Ins. Co.*, 2 Dillon, 160; *Jones* v. *Brooklyn Life Ins. Co.* 61 N. Y., 79; *Boos* v. *World Life Ins. Co.*, 4 Hun, 133; affirmed, 64 N. Y., 236; *Van Valkenburg* v. *Am. Popular Life Ins. Co.*, 70 id., 605; *Piedmont and Arlington Life Ins. Co.* v. *Ewing*, 2 Otto, 377; *Gratton* v. *Nat. Life Ins. Co.*, 15 Hun, 78, 79.) The evidence shows a waiver of proofs of death as required by the policy. (Bliss on Life Insurance [2d ed.], § 278; *Leslie* v. *Knickerbocker Life Ins. Co.*, 63 N. Y., 27; *Dilleber* v. *Knickerbocker Life Ins. Co.* [Ct. Apps. MSS.], decided April 1, 1879; *Johnston* v. *Col. Ins. Co.*, 7 J. R., 318; *Vos* v. *Robinson*, 9 id., 196; *Frances* v. *Ocean Ins. Co.*, 6 Cow., 415; *O'Neil* v. *Buffalo Fire Ins. Co.*, 3 N. Y., 128; *Ætna Fire Ins. Co.* v. *Tyler*, 16 Wend., 402; *Hinchen* v. *Mut. Ben. Life Ins. Co.*, 6 Lans., 24; *Post* v. *Ætna Fire Ins. Co.*, 43 Barb., 364; *Ogden* v. *Marshall*, 4 Seld., 340; *Cornell* v. *Haight*, 21 N. Y., 465; 3 Phillip's Ev., 100; *Grant* v. *Johnson*, 1 Seld., 252; *Taylor* v. *Merchants' Ins. Co.*, 9 How. U. S. R., 390; *Van Allen* v. *Farmers' Joint Stock Co.*, 10 Hun, 397; 72 N. Y., 604; *Prentise* v. *Knickerbocker Life Ins. Co.*, 20 Alb. L. J., 133; *Dohn* v. *Farmers' J. S. Ins. Co.*, 5 Lans., 275, 277; *Sheldon* v. *Atlantic Ins. Co.*, 26 N. Y., 465; *Bodine* v. *Exchange Fire Ins. Co.*, 51 id., 117; *Miller* v. *Eagle Life and Health Co.*, 2 E. D. Smith, 286, 287; *Bennett, Admr.,*

v. *Maryland Fire Ins. Co.*, 19 Alb. L. J., 363; *Bank of Oil City, Assignee*, v. *Guardian Mut. Life Ins. Co.*, 5 Life and Ac. Ins. R., 478; *McComas* v. *Covenant Mut. Life Ins. Co.*, 56 Mo., 573; *Shaw* v. *The Republic Life Ins Co.*, 69 N. Y., 286; *Goodwin* v. *Mass. Mut. Life Ins. Co.*, 73 N. Y., 480.) The defendant failed to prove any breach of warranty in the contract, with reference to the cause of death of the mother and sister of the applicant. (*Dilleber* v. *Home Life Ins. Co.*, 69 N. Y., 256.) Defendant is. estopped from pleading or showing a breach of warranty in the contract caused solely by the false statement of its medical examiner. He was its agent. (*Ames* v. *N. Y. Union Ins. Co.*, 14 N. Y., 263; *Plumb* v. *Cattaraugus Co. Mut. Ins. Co.*, 18 id., 392; *Rowley* v. *Empire Ins. Co.*, 36 id., 550; 3 Keyes, 557; *Le Roy* v. *Park Fire Ins. Co.*, 39 N. Y., 58; *Boos* v. *World Mut. Life Ins. Co.*, 6 N. Y. Sup. Ct. [T. & C.], 368; 64 N. Y., 236; *Pierce* v. *Nashua Mut. Life Ins. Co.*, 9 Am. R., 240; *Merserau* v. *Phœnix Mut. Life Ins. Co.*, 66 N. Y., 278; *Baker* v. *Home Life Ins. Co.*, 64 id., 648; *Life Ins. Co.* v. *Wilkinson*, 13 Wall., 222; *The Am. Ins. Co.* v. *Mahone*, 21 id., 152; *Taylor* v. *Mut. Ben. Life Ins. Co.*, 10 Hun, 52; *Higgins* v. *Phœnix Life Ins. Co.*, 10 id., 461; affi'd by Ct. of App., Mar. 21, 1878; *N. J. Mut. Life Ins. Co.* v. *Baker*, 94 U. S. S. C. R. [4 Otto], 610; *Mowry* v. *Rosendale, Recr., W. Mut. Ins. Co.*, 74 N. Y., 360; *Maher* v. *Hibernia Ins. Co.*, 67 id., 283; *Goodwin* v. *Mass. Mut. Ins. Co.*, 73 id., 480; *Pitney* v. *Glens Falls Ins. Co.*, 65 id., 6; *Pechner* v. *Phœnix Ins. Co.*, id., 195; *Eddington* v. *Ætna Life Ins. Co.* [Ct. App. MSS.], 77 id., 564; *Boos* v. *World Mut. Life Ins. Co.*, 64 id., 236; *Baker* v. *Home Life Ins. Co.*, 64 id., 648; *Higgins* v. *Phœnix Life Ins. Co.*, 10 Hun, 461; *Mowry* v. *Rosendale*, 74 N. Y., 360; *Plumb* v. *Cattaraugus Co. Mut. Ins. Co.*, 18 id., 392; Bliss on Ins. [2d ed.], 114–116; *Miller* v. *Mut. Ben. Life Ins. Co.*, 36 Iowa, 216; *Goodwin* v. *Mass. Mut. Life Ins. Co.*, 73 N. Y., 480; *Mowry* v. *Rosendale*, 74 id., 360; *Rowley* v. *Empire Ins. Co.*, 36 id., 550; *Taylor* v. *Mut. Life Ins. Co.*, 10 Hun,

55; *Partridge* v. *Commercial Fire Ins. Co.,* 17 id., 95; *Le Roy* v. *Park Fire Ins. Co.,* 39 N. Y., 58; *Alexander* v. *Germania Fire Ins. Co.,* 5 Sup. Ct. [T. & C.], 211; *Union Mut. Ins. Co.* v. *Wilkinson,* 13 Wall., 222; *American Ins. Co.* v. *Mahone,* 21 id., 152; *Baker* v. *Home Life Ins. Co.,* *supra;* 64 N. Y., 648, 649; 13 Wall., 222; 21 id., 152; *Rowley* v. *Empire Ins. Co.,* 36 N. Y., 550; *Higgins* v. *Mut. Life Ins. Co.,* 10 Hun, 461; *N. J. Mut. Life Ins. Co.* v. *Baker,* 94 U. S. S. C. R. [4 Otto], 610; Bliss on Life Ins. [2d ed.], §§ 79, 80, 83, 290, 291; *Manhattan Fire Ins. Co.* v. *Weill,* 26 Am. R., 364–370.)

DANFORTH, J.    By the terms of the policy the defendant was required to pay the amount of the insurance "in sixty days after receipt and acceptance of proofs of the death of the insured." As to the manner and form of proof, and the time within which and the person by whom an opportunity should be given to the company to accept and receive the "proofs," the policy is silent. It appeared, however, upon the trial, by the evidence of the defendant's officers, that the company was provided with blanks for such proof, and that it was its custom, upon the death of an insured person, to send these blanks to his representative or for his use to the local agent; that the life insured died on the 8th of November, 1876, at Troy, and immediately thereafter the plaintiff applied to the local agent in that city for the proper blanks, and he, on the eleventh day of that month, after having seen the dead body of the insured, wrote to the defendant informing it of that fact, of the plaintiff's application to him for blanks, and requesting it to furnish them, in order that the usual proofs of death might be made. A similar application was made by the plaintiff through his attorneys; but in both instances the defendant declined to furnish the blanks, "on the ground that the policy was null and void, and that it refused to recognize any claim thereunder." This is the finding of the referee, and he further finds that "the defendant also directed its local agent not to give the usual certifi-

cate required to be given by him in such cases." From these facts the referee finds, as a conclusion of law, that there was " a waiver on the part of the defendant as to, and that it did thereby, and by reason thereof, waive the provision of said policy, requiring the plaintiff to furnish said proofs of loss." That the insured did in fact die at the time alleged, is admitted by the answer, and I think the referee committed no error in the conclusion referred to. The condition itself was a necessary and proper one; but it was wholly for the benefit of the defendant, and might be waived. When, as in this case, the insurer says " we have canceled the policy, and will recognize no claim under it," it must be deemed to have done so. Notice of death had been given, and the defendant had received it from its own agent, as well as from the representatives of the policy-holder. The proofs of death called for by the terms of the policy must, in view of the custom of the defendant before referred to, be held to relate to proofs according to its instructions and upon blanks to be by it furnished. Its refusal to furnish them after application, was equivalent to saying that they would not accept or receive proofs, and the plaintiff could not be required to perform an idle ceremony : (*Shaw* v. *The Republic Life Ins. Co.*, 69 N. Y., 286; *Goodwin* v. *The Mass. Mut. Life Ins. Co.*, 73 id., 480.) It is, however, contended by the learned counsel for the appellant, that the finding upon this question was not within the issue made by the pleadings, and that the referee erred in permitting the plaintiff to amend his complaint. As originally served, it contained an averment that " on or about the 22d day of November, 1876, the plaintiff furnished the defendant with proof of the death of said Terence Grattan." Before the close of the plaintiff's case, but after most of the evidence to which I have adverted, and other evidence had been introduced, and while the plaintiff yet had the case, his counsel asked of the referee leave to amend the complaint by alleging that ' the defendant had waived the requirement in its policy that the plaintiff should furnish proof of the death of " the insured. This was objected

to by the defendant's counsel, on the ground that "it sub-
stantially changes the defense, and therefore the referee is
without power to grant it." Leave was given upon terms,
and among others, that the plaintiff should pay costs to the
defendant. The costs were paid and the amendment made.
It was clearly within the power of the referee to allow it.
It may be added that by accepting the costs imposed as a
condition of the amendment, the defendant is precluded from
availing itself of the objection, if it was otherwise good.
There is no suggestion that the defendant was prejudiced,
and the trial proceeded upon the answer already in.

The remaining questions relate to the merits and are more
important.

It is next contended by the defendant that the life insured,
in his application for the policy, made false and fraudu-
lent representations. *First:* In regard to his occupation.
*Second:* In regard to the cause of the death of his mother
and sister. The application covers more than two pages of
the printed case. It contains questions numbered from one
to seven, most of them divided into parts distinguished by
letters of the alphabet from A to F inclusive, and sub-clauses
characterized by neither figure nor letter, but separated from
the context by blank spaces, calling for twenty-eight answers,
while the medical examiner's certificate annexed thereto
covers more than three pages and calls for upwards of one
hundred answers, to be signed also by the applicant for the
insurance, and, as given, purport to be transcripts of his
answers to the medical examiner. The declaration of the
physician follows, and is simply that he has "considered the
application annexed, and carefully examined Mr. Terence
Grattan, and has witnessed his signature as above." Now
what do we learn from these pages of interrogation concern-
ing the occupation of the life insured? The second ques-
tion of the application calls for the name at full length of
the life proposed for insurance, and in the second subdi-
vision, for his "occupation." The answer is "Soda-water
maker." Then, after more then twenty intervening ques-

tions upon other subjects irrelevant to the one in hand, is this clause: "Occupation. Full particulars regarding the applicant's business or trade must be given. If a mechanic, state in detail all the various kinds of work performed." This does not seem to be a question, but rather a memorandum by way of instruction to the agent; but for whatever purpose designed, there is no answer to it, or observation written against it, and I think the referee was quite right in holding that its position in the application would not warrant the finding, that it was addressed to the life proposed. In the part entitled "Medical Examiner's Certificate," the question first noted above is repeated, and the same answer is given — "Soda-water maker." The seventeenth question is as follows : "What is your opinion of the influence of the said life's occupation on the risk ? " And the answer is : "Is out of doors most of the time selling soda-water — in my opinion, healthy occupation." Now the paper containing these answers is, as I before observed, signed by the life proposed, Terence Grattan, and contains this declaration : "I hereby declare that I have given true answers to all questions put to me by the medical examiner, that they agree exactly with the foregoing, that I am the same person described in the accompanying application, and whose signature is appended to declaration and warranty herewith." These answers must be taken together ; they state the occupation of the life proposed and his then employment. Both were true, and neither inconsistent with the other. By trade a maker of soda-water, he was also vending it. It is quite impossible that the defendant was misled by the answer, and in no aspect was the answer false. The referee's finding that he was a soda-water maker is sustained by the evidence. If a man, for want of employment, steps aside for a season from his regular and usual calling, he does not lose his connection with or give up his craft ; as in this case, he did not cease to be a maker of soda-water because, for the time being, he sold it in the streets. Neither is inconsistent with the other, but both are functions of the same calling.

In regard to the death of his sister. Question four-
teen to be answered by the medical examiner is under
these words : " Family history of life proposed." It calls
for information concerning mother, father, brothers and
sisters, and of the latter the queries are the following :
" Sisters ? Three. Age, if living ? Nineteen, thirteen, eleven.
Condition of health ? Healthy. Age at death ? One twenty-
three and one-half, and one nine months. Disease ? *One not
known to applicant*, and one teething." It appeared that in
another application for insurance in the National Life Insur-
ance Company, in February, 1876, Terence stated the cause
of his sister's death in these words : " Female irregularities,
and terminated in consumption." The referee, upon evi-
dence warranting the conclusion, found that such was the
cause of her death ; " that it was so stated by Terence Grat-
tan to Dr. Guadendorff before signing the certificate of the
medical examiner, at the time the application was made ;
that Dr. Guadendorff was the examining physician of the
defendant, and made said medical examiner's certificate in
his own handwriting ; that question number fourteen in said
certificate, and known therein as the " Family History," and
all of said certificate thereafter except the signature of said
Terence Grattan, was in blank at the time Grattan signed
it ; and that the cause of the death of said sister was in
blank when Grattan made his signature thereto. After that
Dr. Guadendorff filled in the cause of the death of said
sister in the words, " Not known to applicant," although the
real cause of death, as above stated, had been given to him,
and was known to him at the time, and which said Terence
Grattan had reason to believe, and did believe would be cor-
rectly inserted in said certificate, at the time he placed his
signature thereto." And he also found that the statement
now appearing in the report, as to the cause of the sister's
death, was not made to the examiner at any time. This
finding is very satisfactorily sustained by the evidence.
Frederick Eicholz was the defendant's agent in soliciting
Grattan to take out the policy, and he continued to be such

agent down to the time of the trial.   He was examined as a
witness, and his evidence shows the great care taken by
Terence Grattan to get from the family Bible and other
sources, information required by the company and called for
by the numerous questions before referred to.   It was writ-
ten upon paper, and given, in the presence of this agent and
of Terence Grattan, to the examiner.   Eicholz testifies that
on that paper the cause of the sister's death was written
"Female irregularities or weaknesses terminating in con-
sumption;" that no death was stated to have been from any
cause unknown to the applicant.   The medical examiner
testifies that the paper was destroyed ; but by him and two
other witnesses cognizant of the facts, the testimony of
Eicholz was confirmed.   There can be no doubt that the
utmost good faith was exercised by Terence Grattan, in
getting together the information required and communi-
cating it truthfully to the medical examiner and the plain-
tiff's soliciting agent.   The instructions under which the
examiner acted required him to "invariably give the answers
to the following questions in his own handwriting, and
not allow an agent or other person to dictate any part
of them."   These instructions were complied with in that
respect, and the question now is as to the effect of the
misstatement by him, in consequence of his failing to report
accurately the answer given by the life insured.   He was
the agent of the defendant for the purpose of reporting
the answers to the questions referred to, and was so held
out to Terence Grattan.   He was, as medical examiner,
charged with certain duties by the defendant, and was act-
ing in concert with the soliciting agent of the company.   On
the part of the life insured was entire good faith and truth-
fulness, and there is no reason to suspect any intentional
unfairness on the part of the examiner.   The omission was
inadvertent.   Is the company thereby released from its obli-
gation ?   Many decisions in this court show that it is not :
(*Mowry* v. *Rosendale*, 74 N. Y., 360, and cases there cited.)
Within the principle therein recognized as well established,

the erroneous answer must be taken as the declaration of the defendant, and in any controversy depending upon it, must, as between the parties, be taken to be true.   In this case, the physician was not the agent to solicit insurance, but he had an act to perform in regard to it, as the agent of the company.   His written instructions were to write out the answers. In this instance he failed to do it correctly.   The principle upon which it has been held that the company, and not the insured, is responsible for the error of the soliciting agent, is equally applicable here.   This question has been repeatedly considered by this court, and in the recent case of *Flynn* v. *The Equitable Life Ins. Co.* (9 Weekly Dig., 324*), was again before us.   The point presented was similar to the one now under review.   The decision was in conformity with the views above expressed, and the doctrine referred to must be deemed settled.

Nor was it incompetent to prove by parol the actual transaction between the insured and the medical examiner.   It was proper to do this in reply to the defendant's case, without reforming the contract or asking for equitable relief. Fraud and breach of warranty in regard to his sister's death is averred in the answer, and the matter given in evidence was proper in reply thereto.   If sufficient as the foundation for equitable relief or ground for reforming the contract, it was not improper to receive in this action evidence which would defeat the defendant's claim, or which would be competent in any action in a court of equity.   This advantage is secured to the litigant by the union of legal and equitable remedies in one system: (*Emery* v. *Pease*, 20 N. Y., 62; *N. Y. Ice Co.* v. *N. W. Ins. Co.*, 23 id., 357; *Arthur* v. *Homestead F. Ins. Co.*,† Ct. of App. [not yet reported].)

The remaining *inquiry* relates to the exclusion of evidence offered by the defendant for the purpose of showing disease in the mother and sister of the life insured, and therefore the falsity of his representations.   It was offered from two sources: *first*, physician, and, *second*, laymen.   As to the

physician, the *inquiry* is answered by the statute.   Its very
language sustains the ruling of the referee.   "No person," it
says, " duly authorized to practice physic  *  *  *  shall be
allowed to disclose any information which he may have acquired
in attending any patient in a professional character, and which
information was necessary to enable him to prescribe for such
patient as a physician."   The object of this statute defines
its limits ; it is operative between persons named, and applies
to a certain state or condition of facts ; it *operates* between
the physician and his patient whenever that relation exists,
and its object is to compel secrecy as to any information so
acquired by the physician in attending his patient, and
which was necessary to him while acting in that capacity.
It expresses the will of the Legislature, and the duty of the
court is one of verbal construction only.   Is the present case
within it ?   In answer to the question, " Have either of his
parents ever had pulmonary, scrofulous or other constitu-
tional diseases?" the answer was, " No ; " and as to his
mother, the cause of her death was said to have been " fever
after confinement."   The answers are found in the medical
examiner's certificate, but it is claimed that they should be
regarded as coming from the life insured, and for the pur-
pose of the discussion before us, I shall so consider them.
The defense alleges that these answers were false, because, as
it alleges, " his mother and sister had died of consumption."
To maintain this issue, the defendant called Dr. Sheppard,
and proved by him that he was a practicing physician, that
he attended the mother of the life insured in " her last ill-
ness, in a professional capacity."   The defendant thus estab-
lished that the relation between the mother and the witness
was that described in the statute — of physician and patient.
There is no evidence to show that the witness had any earlier
or other acquaintance with her, or that he knew, or visited,
or saw her at any other time, or in any other capacity.   So
far as appears, his introduction to her occurred for the first
time when he was thus called to her in his professional
capacity.   Thereupon the following questions were put to him :

1. " Do you know, and are you able to state the cause of of her death ? "

2. " Did you observe the symptoms that she exhibited in her sickness ? "

3. " Were the symptoms of the disease such that you might have discovered it without the aid of any specific statement made by the patient ; that is, by observation and physical examination, could you have ascertained the character of the disease ? "

4. " Were the symptoms of her disease such that you might have discovered them without their being confidentially disclosed to you by Mrs. Peter Grattan, or any friend or attendant, or through any private examination ? "

Defendant's counsel then read the statement of the life insured, that the cause of his mother's death was intermittent fever after child-birth, and then asked the witness : (5). " Is this statement true ? " This question was asked the witness : (6). " Did you ever treat Mrs. Grattan for intermittent fever, and if so, did you treat it as the radical disease, or as an incidental symptom ? "

These questions, so far as they are material, come so strictly within the prohibition of the statute that an extended discussion of the reasons or ground of exclusion would be out of place.  The first and second questions were preliminary and, standing by themselves, unimportant.  We may assume they would have been answered in the affirmative ; and in view of his profession, and the relation the witness bore to his patient, it would be a necessary inference that his knowledge of the cause of her death was acquired and his observation, of the symptoms exhibited in her sickness, made by him in his character of physician.

The third and fourth questions were immaterial, except as the answers might lead to other questions — as I assume they would have done — calling for the result of such discovery and observation as might have been made under the conditions assumed by the questions.  The matter thus called out would be disclosed in violation of the law.  The third

question is of two clauses; the second clause limits and explains the first, but however considered, was inadmissible. The observation which he might have made, and the physical examination to which the patient was subjected, were permitted to him in his character of physician, and not otherwise. Though the patient had been dumb, it would make no difference. The communication to his sense of sight is within the statute, as much so as if it had been oral and reached his ear. It was not necessary that the examination should be private. It is enough that the witness acquired the information in his character as physician and in the due and proper exercise of his calling. Nor was it necessary for the plaintiff to show in the first instance, by formal proof, that the information was necessary to enable the witness to prescribe. Such, under the circumstances of this case, is the inevitable inference.

In *Edington* v. *Mutual Life Insurance Company* (67 N. Y., 185), the question at this point was thus disposed of. Evidence was there offered to show by certain physicians that the life insured was afflicted with disease, and it was urged "that the testimony they would give was based on knowledge which they obtained solely from their attendance upon him as physicians, and not from any information received from him." It was excluded, and MILLER, J., speaking for the court upon appeal, holds that it was rightfully rejected, and, with other words to the same effect, says : " The point made that there was no evidence that the information asked for was essential to enable the physician to prescribe, is not well taken, as it must be assumed from the relationship existing that the information would not have been imparted except for the purpose of aiding the physician in prescribing for the patient. When it (the statute) speaks of information, it means not only communications received from the lips of the patient, but such knowledge as may be acquired from the patient himself, from the statements of others who may surround him at the time, or from observation of his appearance and symptoms. Even if the patient could not speak, the astute medical observer would

readily comprehend his condition. Information thus acquired is clearly within the scope and meaning of the statute." The doctrine thus enunciated was reiterated and enforced in *Dilleber* v. *Home Life Insurance Company* (69 N.Y., 256), and *Cahen* v *Continental Life Insurance Company* (69 id., 300). So far, therefore, as the questions marked one to four, excluded by the referee, are concerned, he followed the statute and decisions of this court in his ruling.

It is urged, however, by the learned counsel for the appellant that no professional medical action is needed after death ; that the event severs the relation of physician and patient ; and that consequently information of the cause of death cannot be acquired to enable a physician "to prescribe" for a patient. The case before us is not one where the witness was called in for the first time after the death of the patient, but one where the lips of the physician were sealed during the life of the patient, and where, although by death he loses the patient, his lips must remain closed. It was held under the old law that the seal must remain until removed by the patient ; and it is now so provided by statute : (Code of Civil Procedure, § 834.) The witness learned the cause of his patient's death while attending her in a professional capacity, and, as it must be inferred, from the symptoms caused by the disease. The remaining, or fifth and sixth questions, were objectionable for the same reasons. Whether the statement of the life insured as to the cause of his mother's death was true or not, could be answered, if at all, by the witness, by an opinion formed from his observation while an attending physician, and information obtained as such. There was no statement by the life insured, nor any issue before the referee, which made material the inquiry whether "the witness had ever treated Mrs. Grattan for intermittent fever, and if so, whether he had so treated it as the radical disease, or as an incidental symptom." If regarded as part of the general purpose to show the real cause of death, it comes within the exclusion of the statute, and concerning it the witness was not competent to speak.

In *Sloan* v. *N. Y. C. R. R. Co.* (45 N. Y., 125), the plaintiff sued to recover damages for injuries sustained by him in consequence of the negligence, etc., of the defendant, and, among other items, claimed the amount of his physician's bill. The defendant's counsel, on the cross-examination of the physician, asked "whether the plaintiff had the venereal disease while under his care as a physician;" and its exclusion by the trial judge was urged as error and ground for a new trial. This court — the chief judge delivering the opinion — held no error. "We think," he says, "this was privileged under the statute. The question did not in terms ask for any communication from the plaintiff, but it was an inquiry as to the existence of a disease which the plaintiff had while under the care of the witness as a physician. The presumption is, from the question, that he learned it as a physician for the purpose of prescribing. The question itself implies it. To require the plaintiff to make the preliminary inquiry whether he learned the fact for the purpose of prescribing would, in effect, if the fact existed, have deprived the plaintiff of the protection of the statute. It would have proved the fact indirectly, which might be as injurious as if proved legitimately." In *Briggs* v. *Briggs* (20 Mich., 34), it is said of a witness : "He had no knowledge upon the subject except what he obtained in the course of his professional employment, * * * . We do not understand the information here referred to, to be confined to communications made by the patient to the physician, but regard it as protecting, with the veil of privilege, whatever, in order to enable the physician to prescribe, was disclosed to any of his senses, and which in any way was brought to his knowledge for that purpose." On the other hand, in *Edington* v. *Ætna Ins. Co.* (manuscript opinion by EARL, J.),* the question addressed to the physician was held proper by the learned judge because, as is there stated, "it does not appear that he discovered that disease or learned its nature while attending

---

* 77 N. Y., 564.

him (the life insured) professionally. He saw him frequently before he attended him, and saw him after he ceased to attend him, and the court could not say that he could not answer without disclosing the necessary information which he had obtained while in professional attendance upon him." In the case before us, the referee had presented for examination a witness who was first called to the sick woman that he might discover her disease. He learned the nature of it that he might treat her, and watched the symptoms as they developed and terminated in her death. It was for such a purpose, and during this time only that he saw her, and during all this time he attended her as her physician. He had acquired knowledge in no other capacity or for any other purpose. He had none, therefore, that he could disclose. His diagnosis was made upon her employment, and whether aided in this by visible sign or audible communication, can make no difference. Whatever opportunity he had for knowledge concerning her was afforded by his employment, and its import was necessary to him that he might to her advantage practice his art, or, in the language of the statute, " prescribe " for her. The information so obtained must remain enclosed with him, for he is forbidden by statute to " disclose " it. The word must be taken in its fullest sense. He must not tell it; not because the patient declared the communication to be confidential, or because the physician considered it so, but because the statute says that the communication to him shall not be by him disclosed or told. Any other rule will annul the statute, and permit it to be evaded. I confine these observations to the case in hand, or one similar, where communications begin with and follow the employment of the physician, and are the result or consequence of the relation he sustains to his employer or patient. The court need lay down no rule; the statute is the rule, and we are merely to inquire whether the case comes within it. If it does, we should abide by it; for, in the language of CRANWORTH, V. C., in *Balguy* v. *Broadhurst* (1 Sim. [N. S.], 111, " I am sure that it is most incon-

venient to have a rule laid down and the courts struggling to avoid it." Its object is a beneficent one, "it rests on obvious principles of convenience and policy : (1 Stark. Ev., 103; *Wilson* v. *Rastall*, 4 D. & E., 760, per BULLER, J.) ; and it should be so construed as to carry out that object effectually, and, so far as the language will admit, as to reach and defeat all attempts to do, in an indirect or circuitous manner, that which it has prohibited. It must be understood as extending to all such circumventions and rendering them unavailing. The case of *Pierson* v. *The People*,* lately decided by this court and referred to by the appellant, contains nothing inconsistent with the views above expressed. In that case an exception was recognized as one proper and necessary to be made, in the very nature of things, for no intention on the part of the Legislature could be discovered to repeal the general principle which makes the safety of the citizen the supreme law of the State, or to depart from the general system of law which looks to the detection and punishment of crime. It has no bearing upon the case before us.

The testimony of Anthony Smith was properly excluded. After he had testified that he was acquainted with Mrs. Grattan, and saw her during her last sickness, and was familiar with the appearance of persons in consumption, he was asked, "What was your conclusion in reference to the character of her disease ? " The witness was not fitted, by any special training or by his professional education, to speak as an expert or express an opinion in reference to the character of the disease with which Mrs. Grattan was afflicted.

I think no error was committed by the learned referee in reaching the conclusions on which the judgment appealed from rests. It should therefore be affirmed.

All concur, except EARL, J., who concurs in all, save as to the rejection of testimony of attending physician, and as to that dissents.

Judgment affirmed.

* 79 N. Y., 424.