In the Matter of the Probate of the Will of EVA CODDINGTON, Deceased. CORNELIUS D. CODDINGTON, Appellant; WILLIAM R. PECKHAM, Respondent.

Argued January 6, 1954; decided June 3, 1954.

*Arthur B. Ewig* and *Frank Morse Roosa* for appellant. I. The burden of proving testamentary capacity is upon the proponent. (*Rollwagen* v. *Rollwagen,* 63 N. Y. 504; *Delafield* v. *Parish.* 25

N. Y. 9.) II. The evidence supporting the claim that decedent was a victim of insane delusions is uncontradicted and undisputed. It raises only a question of law. (*Matter of Rumsey Mfg. Corp.* [*Corsi*], 296 N. Y. 113; *Matter of Martin* v. *Plaut,* 293 N. Y. 617; *Blum* v. *Fresh Grown Preserve Corp.,* 292 N. Y. 241; *Matter of Trowbridge,* 266 N. Y. 283; *People ex rel. Morrissey* v. *Waldo,* 212 N. Y. 174; *Matter of Case,* 214 N. Y. 199.) III. The delusions entered into and controlled the testamentary capacity of the decedent. (*Matter of Gannon,* 2 Misc. 329, 139 N. Y. 654; *Matter of Heaton,* 224 N. Y. 22; *Seaman's Friend Soc.* v. *Hopper,* 33 N. Y. 619; *Matter of Rice,* 173 Misc. 1038.) IV. The court erred in its rulings on the admission of evidence. (*Holcomb* v. *Harris,* 166 N. Y. 257; *Matter of Cleveland,* 273 App. Div. 623; *Budka* v. *City of Schenectady,* 256 App. Div. 764; *People* v. *Samuels,* 302 N. Y. 163.)

*George F. Kaufman* and *Hugh R. Elwyn* for respondent. I. The Surrogate's finding that testatrix possessed testamentary capacity was amply sustained by the evidence. (*Delafield* v. *Parish,* 25 N. Y. 9; *Horn* v. *Pullman,* 72 N. Y. 269; *Matter of Snelling,* 136 N. Y. 515; *Matter of Delmar,* 243 N. Y. 7; *Matter of Fahrenbach,* 261 App. Div. 43, 285 N. Y. 763; *Matter of Morrison,* 270 App. Div. 552, 296 N. Y. 652.) II. The evidence of objectant failed to sustain his assertion that the testamentary capacity of testatrix was destroyed by insane delusion. (*Dobie* v. *Armstrong,* 160 N. Y. 584; *Matter of White,* 121 N. Y. 406; *Matter of Nicholas,* 216 App. Div. 399, 244 N. Y. 531; *Matter of Heaton,* 224 N. Y. 22; *Pettit* v. *Pettit,* 149 App. Div. 485; *Matter of Loehr,* 187 App. Div. 957; *Clapp* v. *Fullerton,* 34 N. Y. 190.) III. The claims of appellant that the Surrogate committed reversible errors in receiving and rejecting evidence are without merit. (*Matter of Myer,* 184 N. Y. 54; *Matter of Cashman,* 159 Misc. 881, 250 App. Div. 871, 280 N. Y. 681; *Edington* v. *Aetna Life Ins. Co.,* 77 N. Y. 564; *Westover* v. *Aetna Life Ins. Co.,* 99 N. Y. 56; *Renihan* v. *Dennin,* 103 N. Y. 573; *Matter of Coleman,* 111 N. Y. 220; *Feeney* v. *Long Is. R. R. Co.,* 116 N. Y. 375; *Clifford* v. *Denver & Rio Grande R. R. Co.,* 188 N. Y. 349; *Steinberg* v. *New York Life Ins. Co.,* 263 N. Y. 45; *Lippe* v. *Brandner,* 120 App. Div. 230; *Mulligan* v. *Sinski,* 156 App. Div. 35, 214 N. Y. 678; *Matter of See,* 241 App. Div. 525; *Saad* v. *New York Life*

*Ins. Co.,* 201 App. Div. 544, 235 N. Y. 550; *Matter of Warrington* [*State of N. Y.*], 303 N. Y. 129; *Westphal* v. *State of New York,* 191 Misc. 688.)

CONWAY, J.  On September 9, 1951, Eva Coddington of Kingston, New York, an unmarried woman about seventy-five years of age, died at the Hudson River State Hospital to which she had been admitted on July 24, 1951.  The cause of death was a generalized arteriosclerosis, senile psychosis paranoid type. The interval between the onset of the disease and death was four years.

The issue is whether she possessed testamentary capacity when, on February 13, 1951, she executed an instrument purporting to be her last will and testament.

By that instrument she bequeathed various articles of personalty to two second cousins, a third cousin, the minister of the church which she attended, who was named executor, and a friend, Margaret Winfield.  She devised her residence to one of the second cousins, Daisy Quick, and the friend, Margaret Winfield, as joint tenants.  If either of them predeceased her, the survivor was to have exclusive ownership of the property. The residue of her estate was bequeathed to two friends, Elizabeth H. Hendricks and Mary McCullough.  In the event that either of the residuary legatees predeceased her, such legatee's share was to go to the Home for the Aged in Kingston.  If both predeceased her, the whole of the residuary estate was to go to said Home.  Paragraph Tenth, which followed the dispositive paragraphs, provided: " My sole distributees are my nephew, CORNELIUS D. CODDINGTON, of Troy, New York, and my niece, MURIEL SOUTHWORTH, of West Sand Lake, New York. However, I make no provision in this Will for either my nephew, CORNELIUS D. CODDINGTON, or my niece, MURIEL SOUTHWORTH, since it is my wish that my property shall be disposed of in accordance with the foregoing terms of this Will."

The instrument was propounded in the Ulster County Surrogate's Court by Reverend William R. Peckham, the executor named therein.  Decedent's nephew and niece were cited to show cause why the propounded instrument should not be admitted to probate.  The nephew filed an objection to probate upon the

sole ground of alleged lack of testamentary capacity. No objections were filed by the niece.

The Surrogate, after trial without a jury, admitted the instrument to probate and imposed costs upon objectant personally. The Appellate Division, Third Department, affirmed, unanimously, that part of the Surrogate's decree which admitted the instrument to probate, but modified that part which adjudged costs against objectant personally. Objectant appeals as of right to this court from the order and decree of affirmance. No appeal is taken by the petitioner from that part of the decree making costs payable out of the estate instead of by objectant personally.

On this appeal the objectant contends: (1) that the evidence as a whole, as a matter of law, supports no other conclusion but that the testamentary provision wherein testatrix stated that she was not making beneficiaries of her sole two surviving distributees — the niece and nephew — was caused by an insane delusion that she entertained concerning them, viz., that they had been stealing or removing from her home various articles of furniture and other personal belongings; (2) that the Surrogate erred when he sustained objections to certain questions propounded to Dr. Olivet by contestant's counsel; (3) that the Surrogate committed prejudicial error when he excluded from evidence the records of the Hudson River State Hospital where testatrix died, and (4) that the Surrogate committed other errors in ruling on objections to certain questions propounded to lay witnesses.

With respect to (1): The Judges of this court are all agreed that the evidence bearing upon the question of whether or not an insane delusion dictated the provision whereby testatrix declared that: "I make no provision in this Will for either my nephew * * * or my niece * * *", is conflicting. Accordingly, that question is one of fact and not reviewable in this court.

With respect to (4): The Judges of this court are all agreed that what counsel for contestant sought of each of the lay witnesses, by the questions objected to, was an opinion. It is established that lay witnesses are not permitted to express an opinion upon the question of mental capacity. They may

only state their contemporary impressions as to the rationality or irrationality of the conversations or conduct testified to by them (*Matter of Myer*, 184 N. Y. 54, 60). Accordingly, the Surrogate's ruling on the questions propounded by contestant to the lay witnesses was correct.

With respect to (2): Counsel for objectant contends that the Surrogate erred in sustaining objections to the following, and similar questions, propounded by him to Dr. Olivet, testatrix' physician:

" Q. Did this general arteriosclerosis manifest itself in that way during the time that you treated her?

" Q. Now in the treatment of this patient, Eva Coddington, did you observe any such mental changes?

" Q. Was she then still suffering from a generalized arteriosclerosis?

" Q. Can you tell us, Doctor, what was the physical and mental condition of the decedent in the month of January, 1951? "

These questions were objected to upon the ground that they called for privileged communications between physician and patient prohibited by section 352 of the Civil Practice Act. Counsel for proponent stated: " I want to make the position of the proponent here absolutely clear. We do not for an instant say that this physician cannot testify to anything. What we do say is that he cannot testify as to any confidential communication or as to any matter which would tend to disgrace the memory of the patient. I am objecting to this question upon the same grounds that I objected to the question in the *Cashman* case [*Matter of Cashman*, 159 Misc. 881, affd. 250 App. Div. 871, affd. 280 N. Y. 681], that the question is *entirely too broad* * * *." (Emphasis supplied.)

At common law communications made by a patient to his physician for the purpose of receiving medical treatment, even though made in strictest confidence, were not privileged (*Edington v. Aetna Life Ins. Co.*, 77 N. Y. 564, 569; *Duchess of Kingston's Case*, 20 How. St. Tr. 573, 613).

In New York in 1828 a statutory innovation was made establishing the privilege. (See 8 Wigmore on Evidence, § 2380.) The privilege is now contained in section 352 of the Civil Prac-

tice Act: " A person duly authorized to practice physic or surgery, or dentistry, or a registered professional or licensed practical nurse, shall not be allowed to disclose *any* information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity * * *." (Emphasis supplied.)

The reasons which induced the Legislature to make such communications privileged are clearly indicated in *Edington* v. *Mutual Life Ins. Co.* (67 N. Y. 185, 194 [MILLER, J., 1876]): " It is a just and useful enactment, introduced to give protection to those who were in charge of physicians from the secrets disclosed to enable them properly to prescribe for diseases of the patient. To open the door to the disclosure of secrets revealed on the sick bed, or when consulting a physician, would destroy confidence between the physician and patient, and, it is easy to see, might tend very much to prevent the advantages and benefits which flow from this confidential relationship."

In that case we held (pp. 194–195) that the prohibition against a physician's disclosure of information acquired while attending a patient " means not only communications received from the lips of the patient but such knowledge as may be acquired * * * from the statement of others who may surround him at the time, or from observation of his appearance and symptoms. Even if the patient could not speak, or his mental powers were so affected that he could not accurately state the nature of his disease, the astute medical observer would readily comprehend his condition. Information thus acquired is clearly within the scope and meaning of the statute."

So, it will be seen that in 1876, when the case of *Edington* v. *Mutual Life Ins. Co.* (67 N. Y. 185, *supra*) was decided, the privilege existing between a physician and his patient was so broad that a physician could not testify even as to knowledge gained from observation of his patient's appearance during the period of attendance.

Three years later in 1879, this court decided the case of *Edington* v. *Aetna Life Ins. Co.* (77 N. Y. 564, *supra*). That was an action upon two policies of life insurance. In his applications the insured warranted that he was then in good health and sound body and that he had not during seven years pre-

vious thereto had any severe disease. He died within three years after making application for the insurance. Upon the trial it appeared that the death of the insured was caused by nervous apoplexy. The insurer offered to prove that death was the result of some disease of long standing.

A physician who had at one time attended the insured professionally was asked if the insured was cured when he left his hands; if in his opinion insured was in good health, of sound body, and " ' Excluding any knowledge or information that you [the physician] obtained while treating  *  *  *  [the insured], and judging from his appearance from that time until 1867, what is your opinion as to whether he was a man in good health, of sound body, and a man who usually enjoyed good health? ' " (77 N. Y. 564, 568, *supra*.) It is important to note that the physician had seen the insured frequently before he attended him professionally and saw him after he ceased to attend him. In his opinion, Judge EARL concluded that it was error to sustain the objections to the questions (1) since the trial court could not, from the evidence, determine whether the physician discovered the nature of the disease with which the insured · was afflicted while attending him professionally, and (2) since one of the questions in terms excluded all knowledge or information obtained while the physician was engaged in professionally treating the insured. After thus disposing of the issue, Judge EARL added this comment (p. 571): " It will not do to extend the rule of exclusion so far as to embarrass the administration of justice. It is not even all information which comes within the letter of the statute which is to be excluded. The exclusion is aimed at confidential communications of a patient to his physician, and also such information as a physician may acquire of secret ailments by an examination of the person of his patient. The policy of the statute is to enable a patient, without danger of exposure, to disclose to his physician all information necessary for his treatment. Its purpose is to invite confidence and to prevent a breach thereof. [Citing case.] Suppose a patient has a fever, or a fractured leg or skull, or is a raving maniac, *and these ailments are obvious to all about him, may not the physician who is called to attend him testify to these matters?* In doing so, there would be no

breach of confidence, and the policy of the statute would not be invaded. These and other cases which might be supposed, while perhaps within the letter of the statute, would not be within the reason thereof.'' (Emphasis supplied.)

So it was that Judge EARL propounded the view that the privilege should not prohibit a doctor from testifying at least as to those observations as to which a lay person might testify.

A new trial was ordered. Chief Judge CHURCH, and Associate Judges RAPALLO and MILLER concurred '' in result on ground that rulings on questions of evidence referred to in opinion were erroneous; FOLGER, J., took no part; DANFORTH, J., having been counsel took no part; ANDREWS, J., absent.'' (*Supra,* p. 573.) What the members of this court intended by their concurrence in the result became clear in later cases.

Thus, in *Grattan* v. *Metropolitan Life Ins. Co.* (80 N. Y. 281), another action upon a life insurance policy, the insurer sought to show the falsity of representations in the application of the insured as to the cause of death of his mother. The insurer called a physician who testified that he attended her in her last illness; it did not appear that he ever visited or saw her at any other time or in any other than a professional capacity. The witness was then asked if he knew or was able to state the cause of her death; if he observed the symptoms were such as might have been discovered by observation and physical examination, without the aid of any specific statement from the patient, or without their being confidentially disclosed by her, or any friend or attendant, or through any private examination; and also if the statement of the insurer as to the cause of death was true. We held that such testimony was properly excluded, quoting the language of *Edington* v. *Mutual Life Ins. Co.* (67 N. Y. 185, *supra*) to the effect that the privilege extended even to observation of the patient's appearance. In the course of his opinion, Judge DANFORTH explained the reason for the concurrence in the result by three Judges in the *Edington* case (*Edington* v. *Aetna Life Ins. Co.,* 77 N. Y. 564, 573, *supra*) : '' the question addressed to the physician [in that case] was held proper by the learned judge [EARL] because, as is there stated, ' it does not appear that he discovered that disease or learned its nature while attending him (the life insured) professionally. He saw

him frequently before he attended him, and saw him after he ceased to attend him, and the court could not say that he could not answer without disclosing the necessary information which he had obtained while in professional attendance upon him.' " (80 N. Y. 281, 299–300, *supra.*)  All concurred in Judge DAN-FORTH's opinion except Judge EARL, who concurred in all " save as to the rejection of testimony of attending physician, and as to that dissents " (p. 301).

Still later, the same question reached this court in *Renihan* v. *Dennin* (103 N. Y. 573), a will contest in which a physician who had been called in by the attending physician a short time before the testator's death and the execution of the will was asked to describe the appearance and condition of the sick testator; to state whether in his judgment testator was dying and whether testator was in such a condition that he was capable of under-standing and taking into account the nature and character of his property and of his relations by blood and marriage to those who were or might become the objects of his bounty, and make an intelligent disposition of his property by will.  Objections to those questions were sustained on the ground that the witness was incompetent to testify as to those matters.  Judge EARL wrote the opinion for the court and all concurred.  He declared (103 N. Y. 573, 579–580, *supra*): " It is also claimed that the statute [establishing the privilege] should be so construed as only to prohibit the disclosures by a physician of any informa-tion of a confidential nature obtained by him from his patient while attending him in a professional capacity.  Such was the view of the statute taken by me in my opinion in *Edington* v. *Ætna Life Ins. Co.* (77 N. Y. 564) ; *but my brethren were then unwilling to concur with me in that view.  When the same ques-tion again came before the court in Grattan v. Metropolitan Life Ins. Co. (80 N. Y. 281) I again attempted to enforce the same view upon my brethren, and again failed, and it was then dis-tinctly held that the statute could not be confined to information of a confidential nature, and that the court was bound to follow and give effect to the plain language without interpolating the broad exception contended for."*  (Emphasis supplied.)

He then felt impelled to point out to the Legislature that: " It is probably true that the statute, as we feel obliged to construe it, will work considerable mischief. In testamentary cases where the contest relates to the competency of the testator, it will exclude evidence of physicians which is generally the most important and decisive. In actions upon policies of life insurance where the inquiry relates to the health and physical condition of the insured, it will exclude the most reliable and vital evidence which is absolutely needed for the ends of justice. But the remedy is with the legislature, and not with the courts." (103 N. Y. 573, 580, *supra.*)

That was in December of 1886. Judge EARL had consistently retained his belief and position in three cases without success in the period in which volumes 77 to 103 (1879–1886) of our reports were published. Four and one-half years later, in May of 1891, the Legislature acted. An amendment was made to section 836 of the Code of Civil Procedure so as to provide for two types of waivers of the privilege. (L. 1891, ch. 381.) The amendment read: " The last three sections [forbidding disclosure by a physician] apply to any examination of a person as a witness unless the provisions thereof are expressly waived upon the trial or examination by the person confessing the patient or the client. But a physician or surgeon may upon a trial or examination disclose any information as to the mental or physical condition of a patient who is deceased which he acquired in attending such patient professionally, *except confidential communications and such facts as would tend to disgrace the memory of the patient,* when the provisions of section eight hundred and thirty-four have been expressly waived on such trial or examination by the personal representatives of the deceased patient or if the validity of the last will and testament of such deceased patient is in question, by the executor or executors named in said will." (Emphasis supplied.) That language is now contained in section 354 of the Civil Practice Act. The power to waive has, however, under the Civil Practice Act, been granted to the surviving spouse, or any heir at law, or any of the next of kin of the deceased, or any other party in interest, which was not the case when the Legislature first enacted the waiver provision.

It will be noted that the section provides for a complete waiver by the patient. However, when the patient is deceased and the validity of the last will and testament is in question, only a limited waiver is possible. The physician may then disclose any information as to the mental or physical condition of the deceased patient which he acquired in attending the patient professionally " except confidential communications and such facts as would tend to disgrace the memory of the patient ".

What did the Legislature intend by " confidential communications "? That precise issue reached this court in *Matter of Cashman* (159 Misc. 881, affd. 250 App. Div. 871, affd. 280 N. Y. 681, *supra*).

*Matter of Cashman,* like the present case, was a will contest. The objectant claimed that the testatrix did not possess testamentary capacity. Testatrix' doctor was asked:

" Q. At that time in 1932, what did you find in connection with her condition?

" Q. Doctor, based upon your experience and observation of her and your treatment of her at the times you have stated, in your opinion on March 6, 1935, being the date the alleged will and testament is claimed to have been executed by her, was she of sound and disposing mind and memory "?

Both of those questions were objected to upon the ground of the physician-patient relationship. The objections were sustained, and the will admitted to probate.

The sole issue presented to this court, then composed of Chief Judge CRANE and Associate Judges LEHMAN, O'BRIEN, HUBBS, LOUGHRAN, FINCH and RIPPEY, was the propriety of the rulings on the objections to the questions quoted.

The history of the cases and of the waiver statute was traced, although we wrote no opinion. It was noted that Judge EARL had expressed the view that the privilege should exclude only " disclosures by a physician of any information of a confidential nature obtained by him from his patient while attending him in a professional capacity." (103 N. Y. 573, 579, *supra*.) It was concluded that the provision for waiver was doubtless added to the statute in accordance with this suggestion of Judge EARL. That left the question: " When is such information ' of a confidential nature '? " Our court decided that a communication to a doctor

is " confidential " when it is information acquired by the doctor as a result of confidence reposed in him as such by the patient. That is, our court determined that the Legislature intended to adopt the suggestion of Judge EARL in the *Edington, Grattan* and *Renihan* cases (*supra*) viz., that physicians be permitted to testify in such cases, in event of waiver to such matters as they could have noticed and described as laymen. We held that the limited waiver was no broader than that. Our court considered that it would be proper to ask the physician: " Excluding from your consideration any confidential matter and any secret ailment discovered by you, and confining yourself to matters that were *obvious to any observer,* was the testator in your opinion of sound mind "? etc.

That case was decided in 1939 — fifteen years ago. It has never been overruled or limited and is the controlling precedent. The fact that the court did not set down its views in an opinion does not, of course, lessen the force of the case as binding precedent. In interpreting the limited waiver provision of section 354 of the Civil Practice Act, our court in the *Cashman* case had before it the statement by the Surrogate (159 Misc. 881, 886, *supra*): " While it may not be against public policy to permit the patient himself to waive this privilege without limitation, nevertheless, reason dictates that after one's death *his memory should be protected even as against his executor, heirs,* etc." (Emphasis supplied.) That is true. The decedent is concerned during his life that his personal dignity be preserved even after his death. If the court erred in interpreting the legislative intent, or if a different policy is to be declared or a change made, the Legislature must so ordain.

In the present case Dr. Olivet was asked whether in the treatment of testatrix he observed any mental changes. He was also asked to describe her mental and physical condition at a time that he was attending her. It is true that he was not asked in so many words what he " found " in connection with testatrix' mental capacity or what opinion he formed of the testatrix' mental and physical condition " based " on his treatment of her, as was the physician in the *Cashman* case, *supra,* but it is evident that he, like the physician in the *Cashman* case, was being asked to divulge what he knew of the testatrix' mental and physical

condition based on information acquired by him as the result of confidence reposed in him by Eva Coddington. That is apparently why proponent's counsel, who was also proponent's counsel in the *Cashman* case, objected to the questions with which we are concerned, but made no objection when counsel for contestant asked Dr. Olivet:

" Q. Doctor, I want you to disregard any information or observations that you may have acquired concerning Eva Coddington up to April, 1949, when Mary [Eva's sister] died, and base the answer to the questions I am going to ask you entirely upon your observations and conversations had with Eva Coddington, outside of your professional calls with respect to her, and I ask you, bearing in mind what was the mental condition of Eva Coddington at about the time of the death of her sister, Mary, in April, 1949. A. I had several conversations with Eva Coddington on a non-professional basis up to the time of Mary's death?

" Q. That is correct. A. On a non-professional basis, in those conversations I felt that Eva was incompetent, irrational and had no sense of value or appreciation of her relatives, and even her sister, at the time of her death.

"Q. Will you say that the mental condition which you have described earlier in your testimony as to her conduct in April, 1949, was at least the same, if not worse on February 13, 1951? A. I would feel it would have to be worse."

In our opinion the rule of the *Cashman* case (*supra*) applies and the Surrogate did not err in sustaining the objections to certain questions addressed to Dr. Olivet.

With respect to (3): The records of the Hudson River State Hospital were produced before the Surrogate pursuant to an order of that court made under the authority of section 20 and subdivision 9 of section 34 of the Mental Hygiene Law. Contestant's counsel, under the authority of that order, had inspected the records. When contestant's counsel sought to introduce them into evidence on the trial, the hospital's own representative objected to their admission. Counsel for proponent also objected to their admission upon the grounds (1) that they contained confidential and privileged communications, and (2) that they were hearsay, no opportunity having

been afforded the proponent to cross-examine those who made the records. The court sustained the objections on both grounds.

In our opinion the second ground upon which proponent objected is without merit but the first ground is well founded. Section 374-a of the Civil Practice Act, providing for the admission into evidence of records made in the regular course of business, was enacted to overcome the objection that such records were hearsay and we have held that hospital records are included within the records to which section 374-a is applicable (*People* v. *Kohlmeyer*, 284 N. Y. 366, 370). But we were careful to say, in that case, that they are admissible, " no question as to privilege being presented " (p. 369).

The hospital records here involved were made by physicians who treated testatrix and contained statements as to the observations of those physicians as to the condition and the treatment of the testatrix and also as to the conclusions of doctors with reference to the disorder of testatrix. Undoubtedly, parts of the hospital records were the result of " confidential communications " and, therefore, the doctors could not have testified to such matters had they been called to the stand. We perceive no valid reason why the rule should be different merely because the objectionable matter has been reduced to writing. The purpose of section 374-a of the Civil Practice Act was to overcome the objection of the hearsay rule, not to destroy or weaken the privilege existing between physician and patient.

The order of the Appellate Division should be affirmed, with costs to both parties, payable out of the estate.

Van Voorhis, J. (dissenting). The probate of a will is contested upon the ground that testatrix was mentally incompetent at the time of its execution. Although her attending physician was evidently prepared to testify that she was incompetent to make a will, and to do so on the basis of a diagnosis that she suffered from arteriosclerosis in an advanced stage, his testimony was excluded upon the ground that it would have involved the disclosure of a privileged communication contrary to section 352 of the Civil Practice Act. This ruling was made notwithstanding that there had been a waiver of the privilege to the full

extent authorized by section 354. The latter section permits such waiver if the validity of the last will and testament of the doctor's deceased patient is in question, and allows the physician to " disclose any information as to the mental or physical condition of a patient who is deceased, which he acquired in attending such patient professionally, except confidential communications and such facts as would tend to disgrace the memory of the patient ". Arteriosclerosis tends in no manner to disgrace the memory of a decedent, and the rulings excluding the professional opinion of this physician must have been made upon the theory that permitting him to testify would have disclosed a confidential communication. In considering that question of law, attention is directed to the questions which were asked of testatrix' attending physician, which he was not allowed to answer.

Without objection, this doctor testified that he treated testatrix for a condition known as generalized arteriosclerosis from 1943 until July, 1951, when she entered the State hospital. The will propounded for probate was executed February 13, 1951. Although this doctor testified without objection that this meant general hardening of the blood vessels including degenerative changes in the brain area, which manifests itself in action, movement and speech, as well as in the thought of an individual, objection was sustained to the following questions:

" Q. Did this general arteriosclerosis manifest itself in that way during the time that you treated her?

" Q. Now, in the treatment of this patient, Eva Coddington, did you observe any such mental changes?

" Q. Was she then still suffering from a generalized arteriosclerosis?"

The last question related to an occasion when this physician saw the patient in January, 1951, less than one month before she made this will.

Inasmuch as it was found that testatrix was competent to make a will, and this will has been admitted to probate, it is manifest that this testimony by her own attending physician was of the utmost importance upon the question directly at issue, and that its exclusion was reversible error unless these rulings were legally correct.

As has been indicated, these questions confined the witness to testimony in connection with testatrix' condition of arteriosclerosis. This is unlike the controlling question addressed to the expert witness in *Matter of Cashman* (159 Misc. 881, affd. 250 App. Div. 871, affd. 280 N. Y. 681) inquiring " what did you find in connection with her condition? ", where it was possible that the witness in answering might have expressed a diagnosis of a mental condition induced, for example, by venereal disease or habitual intoxication, which would have been properly excluded for the reason that it might tend to disgrace the memory of the decedent.* No opinion was written by the appellate courts in the *Cashman* case.

The only ground, as above stated, on which the exclusion of the instant testimony can be upheld, is that any professional opinion concerning the condition of a patient must necessarily involve the disclosure of a confidential communication such as is prohibited by section 354 of the Civil Practice Act. The effect of affirming this decree is thus to hold that it is impossible to waive the privilege between physician and patient where the latter is deceased, beyond permitting the physician to testify to observations which he has made while attending the patient in a professional capacity which could have been understood and described by the ordinary layman. The result is that waiver of the privilege conferred by section 352 of the Civil Practice Act by a personal representative or survivor of a deceased patient, has no effect except to permit the attending physician to testify to items concerning the appearance, conversation and behavior of the patient which he would have been capable of noticing without being equipped with any special training or knowledge, and that he would have been competent to describe upon the witness stand if he were not a doctor of medicine. This is a construction of sections 352 and 354 of the Civil Practice Act which is narrower than seems to me to be required by the use of the words " confidential communications " in section 354, and which is not likely to promote the ends of justice. Prior to the enactment of any statute permitting waiver in the case of deceased persons, this court considered itself reluctantly

---

* (It is, of course, not meant to imply that the testatrix Cashman did suffer from those ailments).

required to rule out medical testimony in all such instances (*Renihan* v. *Dennin,* 103 N. Y. 573). At the end of the opinion per EARL, J., concurred in by a unanimous court, it was said: " It is probably true that the statute, as we feel obliged to construe it, will work considerable mischief. In testamentary cases where the contest relates to the competency of the testator, it will exclude evidence of physicians which is generally the most important and decisive. In actions upon policies of life insurance where the inquiry relates to the health and physical condition of the insured, it will exclude the most reliable and vital evidence which is absolutely needed for the ends of justice. But the remedy is with the legislature, and not with the courts." (P. 580.)

Notwithstanding that the *Renihan* case (*supra*) is generally regarded as having resulted in the enactment of what is now section 354 of the Civil Practice Act, the decision in the pending case reverts, as it seems to me, in major part to the situation which existed before the waiver provision in the case of decedents was enacted by the Legislature.

The reasoning underlying this restricted construction of section 354 derives from the use of the words " disclosures by a physician of any information of a confidential nature obtained by him from his patient while attending him in a professional capacity ", as they are employed in the opinions in the *Renihan* case (*supra*) and in several earlier decisions. The majority opinion reasons that these words thus became words of art, synonymous with anything which the doctor learned that was necessary in order to enable him to treat the patient. " Confidential communications " are, of course, words of a general nature, not easily definable. It would have been desirable, perhaps, if the Legislature had adopted language of greater precision in limiting the scope of the waiver permitted by section 354. It is reasoned that, in adopting section 354, the Legislature did not go the full length of the recommendation which was made by the last paragraph in the *Renihan* opinion, which was quoted above, that pointed out that the opinion evidence of physicians is generally important and may well be decisive in will contests and life insurance actions where the inquiry relates to the health

and physical condition of the decedent. It is said that the Legislature went only so far as to carry out the limitation of the privilege which was put forward by Judge EARL in the *Edington* and *Grattan* cases (*Edington* v. *Ætna Life Ins. Co.*, 77 N. Y. 564; *Grattan* v. *Metropolitan Life Ins. Co.*, 80 N. Y. 281), before the waiver section had been enacted in any form. The conclusion of that reasoning is that the Legislature declined to permit the expert opinion evidence of physicians to be introduced concerning their deceased patients under any circumstances, merely permitting them to testify in event of waiver to such matters as they could have noticed and described as laymen. That is much more limited than the extent which this court unanimously found to be desirable in *Renihan* v. *Dennin* (*supra*), but marks the limit of the liberality which was unsuccessfully contended for by Judge EARL prior to the enactment of any statute permitting waiver in the case of deceased patients.

Whatever may have been the operation of the minds of the draftsmen with the *Renihan* opinion before them, it seems to me that section 354 of the Civil Practice Act (and Code Civ. Pro., § 836, from which it was derived), has been more broadly interpreted than this by Bench and Bar since the original enactment thereof by chapter 381 of the Laws of 1891, and that the Legislature must be deemed to have ratified and sanctioned the practical construction which has been placed upon it by failure to amend in this respect during the intervening years. If the practical construction of a statute is well known, the Legislature is charged with knowledge of it and its failure to interfere indicates acquiescence therein (*People* v. *Charbineau*, 115 N. Y. 433; *Matter of Maxson Corp.* v. *Ralph*, 182 Misc. 144, affd. 268 App. Div. 753, affd. 294 N. Y. 880; *Faingnaert* v. *Moss*, 295 N. Y. 18).

Concerning what has been the traditional interpretation of the waiver section, the profession would, I think, receive with considerable surprise a holding that the waiver of the privilege of a deceased patient signifies nothing more than that the attending physician shall be permitted to testify merely to what he could have testified if he were not a doctor. Indeed, this means that he cannot testify as freely as a layman, in view of the

limitation that no facts shall be admitted which would tend to disgrace the memory of the patient. That is a restriction which does not apply to laymen.

This restriction would appear to have been inserted unnecessarily into section 354, if, even without it, the attending physician is still prohibited from giving any expert opinion evidence. It might be thought that this would effectively prevent him from disclosing anything involved in the patient's condition which would tend to disgrace the memory, without the need for the additional words to that effect.

The decisions under section 354 of the Civil Practice Act and section 836 of the Code of Civil Procedure scarcely support the narrow interpretation now being placed upon it. In *Holcomb v. Harris* (166 N. Y. 257) the judgment was reversed due to the exclusion of expert testimony of the former physician of a decedent. In that instance, the waiver was by the personal representatives of the deceased patient. Concerning calling the physician as a witness, the court said (p. 263): " It is difficult to imagine a clearer act of waiver than for the legal representatives of a deceased patient to call his former physician to the stand and ask him to disclose professional information falling within the provisions of section 834 of the Code. It is apparent that neither court nor counsel was misled in this situation. The rejected evidence was material, and, while regretting the necessity for a new trial, we are compelled to hold that this ruling of the trial judge presents reversible error."

The testimony excluded consisted in a statement by the physician of " testator's physical condition at that time." There is no suggestion in the opinion that merely lay testimony by the physician would be admissible, but, on the contrary, it is described in the opinion (p. 262) as being " necessary information acquired in attending a patient professionally ". The *Holcomb* case (*supra*) was decided in 1901, and there would appear to have been ample opportunity for the Legislature to have restricted the scope of the waiver section if it had thought that the case was improperly decided. In *Murray* v. *Physical Culture Hotel* (258 App. Div. 334) decided in 1939, it was pointed out that " it is often as much in the interest of the patient to reveal what an examination by his physician discloses as it is to conceal it."

(P. 337.) The court further stated: "In this instance the waiver which the plaintiff attempts to elicit is not to be made by the patient but by his administrator as a witness. The power of an administrator to waive is prescribed by section 354 and is not so broad as that of the patient would have been if living, inasmuch as the administrator is precluded in any event from permitting the disclosure of confidential communications or of such facts as would tend to disgrace the memory of the decedent. The testimony which the plaintiff is attempting to bring out that Mr. Thomas suffered from tuberculosis for some time before he died is not a confidential communication and has no tendency to disgrace his memory. It is, therefore, within the power of his administrator under section 354 to grant the waiver. There is no doubt that Mr. Thomas would have been competent to waive it himself, if living, and the circumstances of the case bring it within the statute in so far as it confers an identical power upon his administrator." (P. 338.)

It was further pointed out that, even where the deceased patient's estate is not suing, " the administrator may think that it is in the interest of his decedent that the true facts concerning his health and death shall be made public if there is going to be a trial, rather than to have the disease which afflicted him left in doubt and ambiguity with possible inferences drawn which might reflect upon his reputation." (P. 338.)

In the *Murray* case (*supra*), plaintiff's fellow patient in a sanitarium had died, from whom it was contended that plaintiff had contracted tuberculosis due to negligence of the institution. A necessary link in plaintiff's chain of proof was to establish that this man, from whom Murray claimed to have caught tuberculosis, was suffering from that disease at the time when Murray was placed in the same room with him at the sanitarium. Under the ruling about to be made herein, not only ought the attending physician for the deceased fellow patient to have been precluded from expressing an opinion in the *Murray* case that his patient suffered from tuberculosis when Murray roomed with him, but, if the plaintiff in that case (Murray) had died, his estate might have been prevented from recovering for the further reason that it could not have been established that he died from tuberculosis. It would have been beyond the power of

his personal representatives to have waived the privilege precluding the introduction of any expert testimony of Murray's physician concerning the cause of death of the person whose estate would have been bringing the action. The effect of this ruling should be borne in mind where it is necessary in workmen's compensation cases for the clamant to establish by the attending physician that his examinations of a deceased patient revealed that he had contracted an occupational disease, or where it is necessary in wrongful death actions to establish that death resulted from a disease or morbid condition which was diagnosed and treated by an attending physician.

In *Matter of Cleveland* (273 App. Div. 623, 625) in an opinion by FOSTER, J., now Presiding Justice, it was said:

"Respondents also rely heavily on the *Matter of Cashman* (159 Misc. 881, affd. 250 App. Div. 871, affd. 280 N. Y. 681). In that case, however, the decision of the court was based on the ground that the questions propounded were too broad and might include matter barred by the statute.

" Under the language of the statute the waiver does not extend to confidential communications, and due to the looseness with which both the Bench and Bar have used these terms in the past there may be some difficulty in construing these terms as used in the statute. It has long been held that the prohibition against disclosure of information by a physician embraces all information necessary to treat the patient whether acquired from examination, observation or statements made by the patient (*Edington* v. *Mutual Life Insurance Co.*, 67 N. Y. 185; *Grattan* v. *Metropolitan Life Insurance Co.*, 92 N. Y. 274), and all of these matters have been frequently lumped together as confidential communications. Obviously it is necessary to give these terms a narrower construction when a waiver as permitted by statute is sought to be applied, otherwise the statute would be meaningless. We do not undertake to determine in advance what would amount to a confidential communication in each and every case, but where a waiver has been properly made by a proper party the physician called should be permitted to testify as to the physical and mental condition of the patient (*Holcomb* v. *Harris*, 166 N. Y. 257)."

Numerous decisions have been made in the trial courts permitting the introduction of expert opinion evidence by attending physicians of deceased patients in case of waiver under section 354, such as *Stiles* v. *Clifton Springs Sanitarium Co.* (74 F. Supp. 907, 908) (applying the New York State law); *Waldron* v. *State of New York* (193 Misc. 113, 114–115); *Matter of Ericson* (200 Misc. 1005, 1009). (See, also, 8 Wigmore on Evidence, pp. 802, 815, 823; [1953 Supp.], p. 259; 2 Jessup-Redfield, Surrogates' Law and Practice, pp. 420–421.)

The general rule is that the burden of showing that evidence is privileged rests on the party seeking to exclude it (*Griffiths* v. *Metropolitan St. Ry. Co.*, 171 N. Y. 106, 111).

The natural interpretation of the limitations upon the extent of the waiver authorized by section 354 in the case of a decedent, would appear to be that an attending physician is prohibited from disclosing such facts discerned by him through his special training as a physician or otherwise as would tend to disgrace the memory of the patient, and to preclude him from testifying to intimacies communicated to a doctor by a patient which were manifestly not intended for repetition under any circumstances. It seems to me that that is the manner in which the language of section 354 would be understood by the ordinary person, and (although there is an absence of precise formulations of the meaning) that is the manner in which it has generally been construed by the courts.

By omitting to amend section 354, after interpretations over many years that in case of waiver an attending physician may disclose at least some facts or opinions concerning the physical or mental condition of a decedent which he is qualified to state only by his professional training as a physician, it seems to me that under the decisions above cited the Legislature should be deemed to have adopted a broader construction of the section than the one now placed upon it. It is not difficult to come to that conclusion, even if the case of *Renihan* v. *Dennin* (103 N. Y. 573, 579, *supra*) be regarded as the decision which prompted the enactment of the predecessor section to 354 of the Civil Practice Act. It is a familiar canon of construction that the evil which existed calling for the new enactment is one of the factors to

be considered in its interpretation (*People ex rel. Jackson* v. *Potter,* 47 N. Y. 375, 379). This idea has often been expressed by saying that the courts consider " the mischiefs it was designed to remedy " (*Ayers* v. *Lawrence,* 59 N. Y. 192, 195). If *Renihan* v. *Dennin* prompted the enactment of the waiver section, the last paragraph in the opinion (p. 580) should be considered in which the court expressly pointed out the defectiveness of the previous law, saying: " It is probably true that the statute, as we feel obliged to construe it, will work considerable mischief. In testamentary cases where the contest relates to the competency of the testator, it will exclude evidence of physicians which is generally the most important and decisive." This language certainly did not mean that in testifying physicians should lay aside the knowledge and experience which they have acquired as physicians, but rather that they should use it in describing to the court and jury their diagnosis of the condition of the patient. In enacting the waiver section, it may be thought that the intention of the Legislature was to render this possible.

The decree appealed from should be reversed and a new trial granted, with costs to abide the event.

LEWIS, Ch. J., DESMOND, DYE, FULD and FROESSEL, JJ., concur with CONWAY, J.; VAN VOORHIS, J., dissents in opinion.

Order affirmed.