In the Matter of the Probate of the Will of Mary E. Boyle, Deceased.

Surrogate's Court, Broome County, October 21, 1955.

*Boris Schneeberg* and *Matthew J. Vitanza* for Joseph J. Boyle, proponent.

*Anthony Fischette,* contestant in person.

*Robert L. Sweeney* for St. Mary's Roman Catholic Orphan Asylum of Binghamton, contestant.

*Myles B. Amend* for Christian Brothers Institute, contestant.

*Charles V. Scanlan* and *Myles B. Amend* for House of Calvary, contestant.

*John H. Weidner,* special guardian for Rosalie D'Angelo, an infant, respondent.

PAGE, S. In this contested proceeding for probate, we necessarily must give consideration to each of two wills purporting to have been executed by the decedent above named. For convenience in reference, these will be hereinafter designated as " the first will " and " the second will ".

The first will appears to have been executed by the decedent on May 29, 1951. This will provides a specific bequest of a " dinner ring " and seven general bequests totaling $8,500. Three of these, accounting for $5,000, are to religious organizations. In this first will, the deceased, a widow, devised and bequeathed her residuary estate to her only child, the proponent herein, Joseph J. Boyle, and nominated as executor Anthony Fischette, an attorney, of Binghamton, New York, who had drafted this will.

The second will, purporting to have been executed on the 24th day of June, 1952, in legal effect, is identical with the first will excepting that it omits the specific and seven general bequests contained in the first will, leaving deceased's son as the sole beneficiary thereunder, and nominating him as the executor thereof. The deceased died, a resident of Broome County, New York, on the 11th day of February, 1953.

Upon the petition of Anthony Fischette, a proceeding for the probate of the first will was duly instituted on the 5th day of March, 1953. While this proceeding remained pending in this court, upon the petition of said Joseph Boyle, a proceeding for the probate of the second will, in which were cited all

parties named in the first will, was duly instituted in this court. The present decision, of course, deals only with the issues involved in the above-mentioned second proceeding.

All of the religious organizations beneficially named in the first will and some of the individuals therein named as legatees have appeared herein. Each of the parties respondent who has appeared herein has filed the usual broadside set of objections to the probate of the second will, thereby raising issues to be determined herein as to, (1) a sufficient compliance with the requirements of section 21 of the Decedent Estate Law; (2) as to the volition and mental competency of the alleged testatrix, and (3) as to undue influence having been exerted upon her by the proponent herein.

While living at No. 13 Chapman Street, Binghamton, New York, on February 23, 1952, the decedent was stricken with a severe apoplectic hemorrhage. She was removed to Our Lady of Lourdes Memorial Hospital, of Binghamton, New York, where she remained in critical condition for a period of about five weeks. Upon her having become considerably better, her son had her removed to a nursing home. This institution was and is conducted by Mrs. Ruth A. Heylmun, assisted by her daughter, Frances E. Johnson. They served as the subscribing witnesses to the second will.

Certain facts in relation to the condition and situation of the testatrix while she was a patient at the Heylmun Nursing Home, where the second will is alleged to have been executed, are clearly shown by the evidence. She was completely paralyzed on her right side but had muscular control of her left arm and hand and otherwise on her left side. Apparently her eyesight and hearing remained unimpaired. Her power of speech was limited to gutteral sounds which witnesses who heard her interpreted as meaning, " hello ", " yes ", " no ", and " good bye ". Her responses to questions addressed to her were mostly by motions of her head affirmatively or negatively as the case might be, but no incident recited in the testimony of her ever having responded negatively is recalled. She had several friends who visited her more or less frequently. Reference will be made hereinafter to their testimony relative to her responses to questions and other acts which they, at the time, regarded as rational.

In considering the evidence herein, in its bearing upon the various objections to probate, first attention will be given to the question as to whether there was a sufficient compliance with all the requirements of section 21 of the Decedent Estate

Law. But only publication and requesting the witnesses are questioned.

In relation to the alleged execution of the propounded instrument, it appears that the proponent visited the Heylmun Nursing Home on or about the 24th day of June, 1952. The first either of the subscribing witnesses knew anything about serving as such witnesses was when the proponent, with this second will, which, having by-passed attorneys in Binghamton with whom his mother had been well acquainted, he had had drafted by a lawyer in New York City, put in an appearance at the nursing home and stated to Frances Johnson that his mother wished to make a will and asked her if she and her mother would serve as witnesses. Mrs. Johnson then asked her mother if she would be willing to do this. They entered the hospital room where Mrs. Boyle occupied a bed over which was a table. The alleged will was on this table and it appeared to the witness, Mrs. Johnson, that the decedent "had been reading" it. According to her testimony, the proponent then left the room. She, thereupon, asked Mrs. Boyle if the instrument was her will and did she want Mrs. Johnson and her mother to be witnesses to it. According to this witness's testimony, Mrs. Boyle nodded her head affirmatively. Mrs. Johnson then obtained a pen which she brought in contact with the left hand of the decedent and proceeded to make an X-mark on the signature line at the end of the document here in question. Mrs. Heylmun then appropriately wrote the words "Mary E. Boyle her mark" about the X-mark. Although it is not entirely clear from the testimony, it would seem that the proponent then reappeared in the room and took possession of the alleged will. This whole transaction has the appearance of having been very hurriedly and carelessly consummated.

These subscribing witnesses were subjected to an extensive cross-examination both before and at the trial of this proceeding. To say the least, their testimony was evasive and their general attitude toward examining counsel hostile. Also, several remarkable inconsistencies between the various statements made by these witnesses were developed. In order to avoid getting into a detailed discussion of the testimony of these witnesses, suffice it to say that, from their testimony as a whole, it appears that they had adopted the strategy of firmly resolving in advance that, once having stated that the two vital questions were asked of the alleged testatrix and her affirmative nod given in response thereto, they would "forget" everything else. It was only by very persistent effort that

any information whatever regarding any of the surrounding circumstances or details was obtained by any of counsel for the various objectants.

Although, in order to comply with the required formalities of execution of a last will and testament, no stereotyped or ritualistic process has been legislatively prescribed, yet courts are very strict in requiring a substantially full and complete compliance with all of the various formalities provided by section 21 of the Decedent Estate Law. (*Matter of Booth*, 127 N. Y. 109, 116; *Matter of Mackay*, 110 N. Y. 611, 615.) The policy of our courts requiring strict observance of these formalities, and rightly so, is based upon their salutary effect in tending to prevent the alleged execution of testamentary instruments by persons who are mentally incompetent, or as a result of undue influence or fraud. These considerations are greatly accentuated in a case such as this wherein, at the time of the alleged execution, the decedent was a person of greatly impaired mental ability, and especially so when all of the surrounding circumstances support the inference that a very strong, if not undue, influence had been exerted upon the alleged testatrix by the principal beneficiary of the alleged will.

As stated by Professor Davids, " A strong circumstance in favor of the instrument is found in proof that the attesting witnesses are dissociated from the charge of intervention or of undue influence, are respectable or reputable persons, persons of high standing in the community, members of the bar for many years, or public officers." (See 1 Davids on New York Law of Wills, § 218, and authorities there cited.) In this connection, see also the first paragraph of section 144 of the Surrogate's Court Act, providing that: " Before admitting a will to probate, the surrogate must inquire particularly into all the facts and circumstances, and must be satisfied with the genuineness of the will, and the validity of its execution." In the present case, the proponent's demonstration by evidence is considerably short of being satisfactory and adequate, and objectants' challenge in relation to a proper observance and fulfillment of formalities of execution must, therefore, be sustained.

We pass now to a consideration of the issue of mental competency. In support of his burden of proof, six disinterested witnesses were produced by the proponent. These persons were friends of the decedent, all of whom visited her at the Heylmun Nursing Home, some of them as frequently as every week, both shortly before and after the alleged execution of the presently propounded instrument.

All of these witnesses, in rendering their testimony herein, unlike the subscribing witnesses, appeared to be honest, conscientious, credible and reliable. Although a few of the incidents referred to by them are somewhat persuasive to the effect that, at least on some days, considerable mental alertness had been manifested by the decedent, most of them are not particularly of this character but rather such responses as could very well lie within the scope of mentality of a young child. Moreover, much depended upon how urgently leading questions were addressed to decedent and also as to the witnesses' interpretations of her responses consisting in most instances of her nodding her head affirmatively.

In addition to friends who visited decedent, her special nurse, Joan Jackson, testified on behalf of the proponent. She was a registered nurse who had taken care of the decedent at the Lourdes Hospital and then accompanied her to the Heylmun Nursing Home where she remained with her up until about two months before the execution of the alleged will and returned to visit the decedent at a time which was somewhat closer to the date here in question. Mrs. Jackson testified that on this occasion, '' I don't know what I said but she (meaning the decedent) seemed to recognize me,'' thus connoting uncertainty even as to the question of the decedent's ability to recognize the nurse who had been taking care of her during the first several months of her illness. Some of proponent's other witnesses had testified to the effect that they had seen the decedent hold a spoon and try to feed herself. Mrs. Jackson testified, '' I don't believe she ever did while I was there.'' Some of proponent's other witnesses testified that they felt the decedent was able to read. On this point, Mrs. Jackson stated, '' I don't know that she could read at all.'' In response to a question in regard to the decedent's getting any better or worse, Mrs. Jackson said, '' I would say that she did not make marked progress.''

The testimony of all of proponent's witnesses is significant with respect to what is not shown in any of it. Although the decedent had quite urgent occasions to have done so, there is no evidence that, with her left hand, she ever attempted to write. Also, there is no credible testimony supporting the inference that she could read and understand what she read.

As to the decedent's mental and physical condition between the time of her entrance at the Heylmun Nursing Home and the execution of the second will, the most comprehensive and convincing testimony was given by her attending physician, **Dr.** Alexander A. D'Angelo. A full review of the substance

of his testimony would require much writing, but, in its conclusory bearing upon the issue of mental competency, it is, very convincingly, to the effect that the decedent, on the date here in question, was of practically no mental competency at all and little, if anything, more than an automaton in the hands of those who were in charge of her.

Although the privilege in relation to testimony by an attending physician or a nurse provided by section 352 of the Civil Practice Act was " waived " by all the objectants who appeared herein, counsel for proponent, upon the theory that they were " confidential communications ", objected to the testimony of the attending physician in this case and, under the provisions of section 354 of the Civil Practice Act, moved that all his testimony be stricken. In considering this motion, the most complete and authoritative pronouncement on the legal question involved is contained in *Matter of Coddington* (307 N. Y. 181). This case, in effect, holds that, except such facts as could be observed by a layman, all information his attending physician, in the course of treating him, learned concerning any patient, is to be regarded and treated as " confidential ".

It would be difficult to determine exactly what part of the physician's testimony in this case could be treated as falling within the category of having been " observed by a layman ". It would seem that practically all of it was based on information acquired in treating the patient.

The prevailing opinion in *Matter of Coddington* was written by Judge Conway. In this, he intimated that the construction of the provisions of sections 352 and 354 of the Civil Practice Act supported therein might, in certain cases, operate quite harshly, but that the remedy would be with the Legislature and not with the Court of Appeals. Undoubtedly, as a result of this case, at the 1955 session, the Legislature acted by its enactment of chapter 466 of the Laws of 1955, which became effective April 18, 1955.

In view of this amendment of section 354 of the Civil Practice Act, regulating the competency of a physician or nurse, etc., in relation to the privilege provided by section 352 of the Civil Practice Act as to any testimony such a witness may be able to adduce by reason of his or her professional attendance upon a patient, the rule in *Matter of Coddington* (*supra*) has been abrogated and doctors and nurses, when there is a waiver by any " party in interest ", can now testify as to what had formerly been barred as confidential communications, provided

only that they are not such as tend to disgrace the patient or, in the case of a decedent, his memory. In the present case there appears to be no question involved as to the decedent's memory being " disgraced ".

Upon the trial of the present proceeding, ruling upon the motion of counsel for the proponent to strike out all the doctor's testimony having been reserved, up until the present time there has been rendered no ruling upon this motion. A ruling thereon must now be made. As of now, since April 18, 1955, the adjective law governing the question here involved, of course, is quite different than it was during the trial of the present proceeding. If a ruling on the motion had been made at the time of the physician's testimony, except for some minor portions thereof that might not be within the scope of confidential communications as defined in *Matter of Coddington,* the motion to strike out the testimony would have been granted. However, the question presented being one, of evidence or procedural law, a matter of adjective law, and such law being as it has now, by virtue of the above-stated amendment of 1955, become, the ruling presently to be made must be in accordance with such law. (See *Lazarus* v. *Metropolitan Elevated Ry. Co.,* 145 N. Y. 581, 585, and *Matter of Wilson,* 135 Misc. 670.) The motion of proponent's counsel to strike it out, therefore, must be and is denied.

In this case, even without the testimony of the attending physician, proponent's proof as a whole is considerably short of the substance and quality that would sufficiently remove the grave doubt as to the alleged testatrix's mental competency as of the date of the alleged execution of the document here in question. The effect of retaining all of the testimony of the attending physician is simply to greatly accentuate the doubt which, independently of such testimony, exists anyhow. The conclusion follows that counsel for the proponent has been unable, as, under the circumstances of this case, it appears would have been true of any counsel regardless of his " resourcefulness ", to adequately sustain the burden of proof as to the volition and mental competency of the alleged testatrix, and the respondents' objection to probate on that ground also must be and is sustained.

The remaining issue is as to undue influence charged against the proponent. In this connection, there are certain circumstances with respect to which the proponent is entitled to some degree of favorable treatment. Prominent among these circum-

stances are such considerations as (1) the proponent being decedent's sole distributee, the second will cannot be denominated as an "unnatural" will; (2) the effect of the provision contained in the second will, in its devolutionary effect, is identical with intestacy; (3) the first will is not greatly at variance with the second will, the only difference being that, in the latter, the proponent is made the sole rather than the principal beneficiary, and (4) the proponent, being the only child of decedent, had a right to "influence" her, provided that such influence was not "undue". In cases where one or more of these circumstances exist, the courts recognize a strong tendency in the direction of negativing an implication that the testator had undue influence exerted upon him.

However, in the present case, there surely was influence. The question as to whether this influence was "undue" should be resolved upon presently existing circumstances analogous to those presented in the leading case of *Rollwagen* v. *Rollwagen* (63 N. Y. 504), wherein the Court of Appeals held in effect that whether or not influence is undue is largely dependent upon the mental ability of the alleged testator to have resisted whatever influence was brought to bear upon him in relation to the drafting and execution of an alleged will. (See p. 519.) In a case where the mentality of the alleged testator was impaired almost to the vanishing point, any influence at all might be regarded as having been "undue".

The possibility of undue influence having been exerted would seem to presuppose an alleged testator of some appreciable degree of mentality but whose volition might have been overcome either by force, threats or other form of duress, fraud or persistent "nagging". The best solution of this enigma, as we find it in the present case, is to say that, even though it might or could be thought that the alleged testatrix had some degree of mental competency, it was of such a slight degree that it was easily and readily overcome by the influence brought to bear upon her by the proponent.

In probate cases in relation to issues of testamentary volition, mental capacity, fraud or undue influence, since 1862, in the resolution of such issues, a guiding light has been the great leading case of *Delafield* v. *Parish* (25 N. Y. 9–121). In that case (see pp. 34–35), the Court of Appeals formulated a summarization of these principles as follows:

" 1. That in all cases the party propounding the will is bound to prove to the satisfaction of the court that the paper in question does declare the will of the deceased, and that the

supposed testator was, at the time of making and publishing the document propounded as his will, of sound and disposing mind and memory.

" 2. That this burden is not shifted during the progress of the trial, and is not removed by proof of the *factum* of the will, and the testamentary competency by the attesting witnesses, but remains with the party setting up the will.

" 3. That if, upon a careful and accurate consideration of all the evidence on both sides, the conscience of the court is not judicially satisfied that the paper in question does contain the last will of the deceased, the court is bound to pronounce its opinion that the instrument is not entitled to probate.

" 4. That when it is sought to establish a posterior will, to overthrow a prior one made by the testator in health, and under circumstances of deliberation and care, and which is free from all suspicion, and when the subsequent will was made in enfeebled health, and in hostility to the provisions of the first one; in such case the prior will is to prevail, unless he who sets up the subsequent one can satisfy the conscience of the Court of Probate that he has established a will. And also the prior will is to prevail, unless the subsequent one is so proven to speak the testator's intentions, as to leave no doubt that it does so speak them.

" 5. That it is not the duty of the court to strain after probate, nor in any case to grant it, where grave doubts remain unremoved, and great difficulties oppose themselves to so doing."

In this case, after having given careful consideration to all the evidence on each side, I am constrained to determine that the admission to probate of the presently propounded testamentary instrument cannot possibly be reconciled with the recognition and effectuation of these principles. Their application to the evidence in the present case compels the conclusion that the admission to probate of the alleged last will and testament herein must be denied.

Settle decree accordingly.